**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

ANTOINE M. HAMLIN,              )      CASE NO. 1:13-CV-00286
                               )
              Plaintiff,        )
                               )
       v.                       )      MAGISTRATE JUDGE
                               )      VECCHIARELLI
                               )
CAROLYN W. COLVIN,              )
       Acting Commissioner of Social )
       Security,                )      **MEMORANDUM OPINION AND**
                               )      **ORDER**
              Defendant.        )

       Plaintiff, Antoine M. Hamlin ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"),[1] denying his application for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to the consent of the parties

entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

       On July 14, 2009, Plaintiff filed his application for SSI and alleged a disability

onset date of November 30, 2006.  (Transcript ("Tr.") 13.)  The application was denied

initially and upon reconsideration, and Plaintiff requested a hearing before an

---

       [1]     On February 14, 2013, Carolyn W. Colvin became Acting Commissioner
of Social Security.  She is automatically substituted as the defendant in
this case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

administrative law judge ("ALJ").  (*Id.*)  On June 15, 2011, an ALJ held Plaintiff's

hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and

testified.  (*Id.*)  A vocational expert ("VE") and a medical expert ("ME") also participated

and testified.  (*Id.*)  On September 2, 2011, the ALJ found Plaintiff not disabled.  (Tr.

10.)  On December 18, 2011, the Appeals Council declined to review the ALJ's

decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On February 8, 2013, Plaintiff filed his complaint to challenge the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in

this case.  (Doc. Nos. 16 and 17.)

Plaintiff asserts the following assignments of error: (1) the ALJ erred in finding

that Plaintiff's HIV does not meet the requirements of Listing 14.08(K); and (2) the ALJ

erred in relying upon vocational expert testimony to find that Plaintiff is capable of

performing past relevant work as an assembler or a significant number of jobs in the

national economy.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born on September 9, 1971, and was 37 years old on the date he

filed his application for benefits.  (Tr. 198.)  He had a high school education and was

able to communicate in English.  (Tr. 206, 264.)  He had past work experience as an

assembler/stocker, busboy/prep cook, machine operator, and punch press operator.

(Tr. 208.)  Plaintiff lives with his mother, two brothers, and a niece.  (Tr. 47.)

### B.   Medical Evidence

### 1.    Medical Reports

In 1998, Plaintiff was involved in an industrial accident resulting in the loss of three fingers from his dominant right hand.  (Tr. 48.)  Records from MetroHealth Medical Center reveal that Plaintiff tested positive for HIV on November 12, 2003.  (Tr. 304.)  At that time, his symptoms included tiredness, rashes/sores, itching, neck/shoulder soreness, falling or feeling off balance, feeling depressed, and arthralgia of knee.  (Tr. 305.)  Plaintiff began seeing Michelle Hecker, M.D., for treatment of his HIV in December 2003.  (Tr. 306-307.)  He also enrolled in a research study for infectious disease.  (Tr. 308-309, 312, 321, 330-331, 377-378, 383, 392, 411, 464-467.)

In a follow-up visit for his HIV infection on April 6, 2004, Dr. Hecker reported that Plaintiff was generally doing well but complained of malaise, knee pain, and a rash. (Tr. 310.)  He returned for an urgent HIV visit on August 17, 2004, complaining of painful ulcerations.  (Tr. 313.)  Dr. Hecker reported that Plaintiff had been doing relatively well with his medications.  (*Id.*)  On May 24, 2005, during a visit with Dr. Hecker, Plaintiff complained of back pain and discomfort in his hand.  (Tr. 319.)  In a December 2006 visit, Plaintiff reported that his rash, back pain, and hand pain had all ceased and that he continued to adhere to his medication regimen and was not having any adverse reactions to the medication.  (Tr. 322.)  He denied feeling ill in any way. (*Id.*)

At Plaintiff's visit with Dr. Hecker in February 2007, Dr. Hecker observed that Plaintiff had been off of his medications for awhile but had started back on them.  (Tr. 325.)  He was not regularly adhering to his treatment regimen.  (*Id.*)  In July 2007,

3

Plaintiff reported that he was feeling weak and was not taking his HIV medication regularly.  (Tr. 327.)  In September 2007, Kim Whitely, R.N., noted that Plaintiff had not yet begun the antiretroviral therapy ("ART") regimen that Dr. Hecker had ordered in July.  (Tr. 330.)

In October 2007, Dr. Hecker completed a *Medical Report on Adult with Allegation of Human Immune Deficiency Virus (HIV) Infection.*  (Tr. 335-337.)  She indicated that laboratory testing confirmed Plaintiff's HIV infection.  (Tr. 335.)  Dr. Hecker opined that Plaintiff had moderate restrictions of daily living due to fatigue and nausea related to his HIV infection and HIV medications.  (Tr. 337.)

In November 2007, Plaintiff underwent a psychological evaluation by Dr. Pickholtz.  (Tr. 338-345.)  Testing revealed that Plaintiff had a full scale I.Q. of 46; however, Dr. Pickholtz opined that Plaintiff's I.Q. scores were significant underestimates of his current functioning.  (Tr. 342.)  Dr. Pickholtz reported that there was a strong possibility of exaggeration and malingering in the absence of an organic impairment related to Plaintiff's HIV.  (Tr. 344.)  According to Dr. Pickholtz, unless there was corroboration of significant deterioration, Plaintiff's overall abilities to understand and follow instructions fell within the mild range of impairment, at worst.  (*Id.*)  Dr. Pickholtz opined that Plaintiff's overall abilities to maintain attention to perform simple repetitive tasks fell within the marked range of impairment; his overall abilities to relate to others including fellow workers and supervisors fell within the moderate range of impairment; and his overall abilities to withstand the stresses and pressures associated with low skilled and unskilled labor, from a psychological perspective, fell within the mild range of impairment in the absence of corroboration of some significant organic damage.  (*Id.*)

4

In May 2008, at a follow-up visit with Dr. Hecker, Plaintiff reported being off his medications for one month due to running out and being unable to get to the pharmacy. (Tr. 397.)  Plaintiff complained of pain in his legs and arms when not taking his medication.  (*Id.*)  In August 2008, Plaintiff's medication was changed.  (Tr. 395.)  At his visit with Dr. Hecker in December 2008, Plaintiff reported that he was tolerating his new HIV regimen and was not experiencing side effects, although he continued to miss some doses.  (Tr. 384.)  In April 2009, Plaintiff reported tingling in the feet at times and back pain and asked Dr. Hecker for stronger medication that would help him sleep and ease his pain at night.  (Tr. 379.)  Plaintiff was on his HIV regimen but occasionally missed doses.  (*Id.*)

At a visit with Dr. Hecker in July 2009, Plaintiff complained of back pain, bilateral leg discomfort/pain, some numbness in his hands and feet, small skin lesions on his body, and occasional nausea with his medications.  (Tr. 373.)  He reported that he was trying to take his HIV medications regularly.  (*Id.*)  He also reported having recently traveled to North Carolina to visit his brother who had cancer.  (*Id.*)  Dr. Hecker completed a second *HIV Report* at that time.  (Tr. 369-371.)  She found that Plaintiff did not have any opportunistic or indicator disease due to his condition, but that he had continuous manifestations of HIV due to vertigo symptoms, back pain, neuropathy in his hands and feet, and fatigue.  (Tr. 371.)  Dr. Hecker opined that Plaintiff had marked restrictions of activities of daily living.  (*Id.*)

Plaintiff also saw Kim. M. Whitely, R.N., in July 2009.  (Tr. 372.)  Ms. Whitely reported that Plaintiff remained on ART with improvements in compliance, although he

5

was not completely compliant with his medications and sporadically missed doses for several days at a time.  (*Id.*)

On August 27, 2009, Plaintiff underwent a consultative physical examination by Franklin D. Krause, M.D.  (Tr. 424-430.)  Dr. Krause diagnosed HIV infection, functional loss of the right hand with allegations of phantom pain, and peripheral neuropathy involving the lower extremities with sensory reflex loss secondary to the HIV infection.  (Tr. 426.)  According to Dr. Krause's report, Plaintiff stated that his ability to stand and walk is somewhat limited by parasthesia in his legs and by generalized fatigue.  (*Id.*)  Plaintiff's cell count was below 200.  (*Id.*)

In September 2009, Plaintiff complained of nausea and fatigue with his HIV medications but stated that he was still taking them.  (Tr. 476.)  He reported having had a significant HSV lesion.  (*Id.*)  Plaintiff also complained of significant pain in his lower back and neuropathy in the feet.  (*Id.*)  Dr. Hecker agreed to a trial of Vicodin and a Lidoderm patch as a response to Plaintiff's complaints of low back pain.  (Tr. 476, 478.)  In October 2009, Plaintiff reported that the Vicodin and Lidoderm patch had helped with his pain.  (Tr. 472.)  He also reported experiencing significant nausea.  (*Id.*)  At his November 2009 visit, Plaintiff asked Dr. Hecker to change his medication from Vicodin to Percocet, because he had used his brother's Percocet and it had worked better.  (Tr. 468.)  Plaintiff stated that he had not refilled his Phenergan after his last visit because he did not want to wait in line at the pharmacy.  (*Id.*)  He continued to complain of nausea.  (*Id.*)  Dr. Hecker continued Plaintiff on Vicodin and the Lidoderm patch and advised him that he would not be prescribed medication if there were significant other

6

drugs in his system (besides marijuana).  (Tr. 470.)  Plaintiff's January 2010 urine

sample was positive for cocaine and THC.  (Tr. 479, 490.)

On October 1, 2009, Margaret Zerba, Ph.D., performed a consultative

psychological evaluation.  (Tr. 431-436.)  Dr. Zerba found it "curious" that Plaintiff had a

history of a serious hand accident yet touched inanimate objects in her office in a way

that was at best "unusual."  (Tr. 432.)  She reported that Plaintiff was agitated,

distracted, and preoccupied during the examination and that his insight and judgment

were impaired.  (Tr. 432, 434.)  Dr. Zerba diagnosed schizophrenia, paranoid type and

alcohol dependence.  (Tr. 435.)  She opined that Plaintiff's abilities to understand and

follow directions, pay attention to perform simple, repetitive tasks, relate to others in the

work environment, and withstand stress and pressures of day to day work activity were

impaired due to depression, paranoid delusions, auditory hallucinations including

command hallucinations, anxiety, alcohol dependence, and impaired insight and

judgment.  (Tr. 435.)

Plaintiff returned to Dr. Hecker in February 2010.  (Tr. 486-489.)  Plaintiff

reported feelings of muscle spasms and electric shooting pains throughout his body.

(Tr. 486.)  He reported that his mood was better and that he did not feel significantly

depressed.  (Tr. 486.)  Dr. Hecker advised him that she could not provide him with

narcotics due to the January 2010 urine sample that was positive for cocaine and THC.

(Tr. 486, 479, 490.)  In April 2010, Plaintiff reported complete adherence to his

medications and noted that he was tolerating them well overall.  (Tr. 553.)  His only

complaint was of intermittent mild nausea.  (*Id.*)

At a follow-up visit with Dr. Hecker on April 27, 2010, Plaintiff complained of itchy

7

red spots on his arms and back, significant fatigue, and some dyspnea on exertion.  (Tr. 546.)  He reported that he could walk one to two flights of stairs or two blocks before becoming short of breath.  (*Id.*)  On May 8, 2010, Plaintiff complained of pain and neuropathy symptoms.  (Tr. 548.)  He was using marijuana to help with his appetite and nausea.  (*Id.*)  On May 18, 2010, Plaintiff reported worsening pain in his chest and lower back and worsening neuropathy in his hands.  (Tr. 537.)  He also complained of diffuse pain in his abdomen and reported that he was experiencing nausea and vomiting in the morning but otherwise tolerating his medications.  (*Id.*)  On May 21, 2010, he reported that his pain was worse everywhere and that he had pain due to neuropathy in his feet, legs, and hand.  (Tr. 539.)  He also reported some back and chest pain, some shortness of breath and fatigue, and some nausea with his medications.  (*Id.*)  Dr. Hecker prescribed pain medications but advised Plaintiff that he would have random tox screens and, if the screens showed any drugs other than marijuana, she would stop prescribing the medications.  (Tr. 541.)

On June 29, 2010, Plaintiff reported still having some fatigue and nausea with his medications but with some improvement.  (Tr. 520.)  He reported taking his HIV medications as best as he could.  (*Id.*)  A tox screen on August 12, 2010, came back negative.  (Tr. 518.)

In November 2010, Plaintiff saw Corrilynn Hileman, M.D., an associate of Dr. Hecker.  (Tr. 498-502.)  He reported pain all over, neuropathy, vertigo, and nausea. (Tr. 498.)  He appeared healthy and in no distress.  (Tr. 498.)  Dr. Hileman increased Plaintiff's Percocet prescription.  (Tr. 500.)  In February 2011, Plaintiff reported that Percocet was relieving the pain in his joints and low back.  (Tr. 493.)  In May 2011,

8

Plaintiff told Jennifer Hanrahan, D.O., that he was doing better with his medications and taking them more consistently than in the past.  (Tr. 557.)  He reported that Percocet was helping with his neuropathic pain.  (Tr. 556.)

### 2.    Agency Reports

On January 4, 2008, state agency consultant Maria Congbalay, M.D., reviewed Plaintiff's file and completed a residual functional capacity assessment.  (Tr. 361-368.) Dr. Congbalay opined that Plaintiff would be capable of lifting 20 pounds occasionally and 10 pounds frequently; he could stand and/or walk about six hours in an eight-hour workday; he could sit about six hours in an eight-hour workday; and pushing and/or pulling would be limited in the upper extremity.  (Tr. 362.)  Due to Plaintiff's amputation of three fingers on his right hand, reaching, handling, fingering, and feeling were limited to occasional as to the right hand.  (Tr. 364.)  He would need to avoid concentrated exposure to hazards such as machinery or heights due to limited use of his right hand. (Tr. 365.)

On November 2, 2009, Todd Finnerty, Psy.D., completed a Psychiatric Review Technique form.  (Tr. 450-463.)  He based his medical disposition on a finding of schizophrenia, paranoid type and alcohol dependence.  (Tr. 452, 458.)  Dr. Finnerty opined that as a result of these impairments, Plaintiff would have moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace.  (Tr. 460.)  Dr. Finnerty also completed a mental residual functional capacity assessment.  (Tr. 446-448.)  He assessed moderate limitations in eight of twenty work-related activities.  (Tr. 446-447.)  Dr. Finnerty opined that Plaintiff had the ability to understand, remember, and carry out a wide range of multiple step

9

tasks; he could adapt to changes in the work environment which are routine and easily explainable; he could get along with others including supervisors and co-workers; and he required low time and production standards.  (Tr. 448.)

On November 13, 2009, state agency consultant Arthur Sagone, M.D., reviewed Plaintiff's file and completed a physical residual functional capacity assessment.  (Tr. 437-444.)  Dr. Sagone opined that Plaintiff would be capable of lifting 20 pounds occasionally and 10 pounds frequently; he could sit, stand, or walk for about six hours in an eight-hour workday; he would be unable to use his right hand for handling, fingering, or feeling.  (Tr. 438, 440.)

On January 31, 2010, state agency consultant Carolyn Lewin, Ph.D., affirmed Plaintiff's prior Psychiatric Review Technique form and mental residual functional capacity of November 2, 2009.  (Tr. 481.)

On April 29, 2010, state agency consultant Walter Holbrook, M.D., noted that Plaintiff's symptoms of neuropathy, pain, fatigue, and vertigo could reasonably be expected to result from his medically determinable impairment, but the intensity of his symptoms was not consistent with the totality of the evidence.  (Tr. 491.)  Dr. Holbrook affirmed the residual functional capacity assessment dated October 13, 2009.  (*Id.*)

C.    **Hearing Testimony**

1.    **Plaintiff's Hearing Testimony**

At his hearing on June 15, 2011, Plaintiff testified as follows:

In 1998, Plaintiff was involved in an industrial accident resulting in the amputation of three of his fingers on his dominant right hand.  (Tr. 48-49.)  He still has

his thumb and pinky on his right hand, but his pinky finger often locks.  (Tr. 48.)  His left

hand is fully functional.  (Tr. 50.)  Plaintiff was diagnosed with HIV in 2001.  (Tr. 44.)

Plaintiff lives with his mother, two older brothers, and a niece.  (Tr. 47.)  His

mother is retired and receives Social Security.  (*Id.*)  Plaintiff does not help out around

the house as much as he used to due to vertigo and fatigue.  (Tr. 48.)  He can make

basic meals which are mostly TV dinners.  (Tr. 49.)  He used to be able to do some

cleaning around the house, but since last year (2010) he has done very little.  (Tr. 49-

50.)  "I get moments of energy, but it lasts about an hour, maybe a little longer, and

then I have to lay down."  (Tr. 50.)  He is able to use his left hand when shopping.  (*Id.*)

Plaintiff worked as a machine operator for about a year.  (Tr. 51.)  At that job, he

ran a machine.  (*Id.*)  He also folded boxes until he was unable to do so due to his

finger locking.  (*Id.*)  "[T]hey kept moving me around because I wasn't able to keep up

or do all of what they were asking.  So they tried to give me something else to do and

something else, and I wasn't able to maintain those positions very long."  (Tr. 52.)

Plaintiff also worked at Minute Man, where he was mainly responsible for opening

boxes and looking for missing parts.  (*Id.*)  He has not worked since November 2006.

(Tr. 53.)  He has a certification in computers and uses the computer to surf the Internet.

(Tr. 53-54.)  He applied for a computer job in 2010 but was told that he typed too slow.

(Tr. 54.)  Plaintiff testified that what keeps him from working now is pain, fatigue, lack of

concentration, and irritability.  (*Id.*)

Plaintiff's mom is his best friend.  (*Id.*)  He does not have any other friends.  (Tr.

55.)  He gets along with his two brothers sometimes.  (Tr. 54.)  The only time Plaintiff

11

leaves his house is when he accompanies his mother.  (Tr. 55.)   He does not drive a car or take public transportation.  (Tr. 56.)  He does not like to leave the house and does not like crowds.  (*Id.*)

Plaintiff has concentrated pain in his back and above his knee.  (*Id.*)  He can stand for about 30-40 minutes.  (*Id.*)  He can walk but uses a cane to hold himself up.  (Tr. 56.)  He lacks coordination due to his vertigo.  (*Id.*)  Plaintiff can "never sit still" and finds it very uncomfortable to sit.  (Tr. 57.)  He has problems with neuropathy in his hands and legs that occurs mostly at night and in the morning.  (*Id.*)  He described it as a sharp pain that feels like "a bunch of pins."  (Tr. 58.)  The pain gets worse when he sits still for a long period of time.  (Tr. 59.)  Plaintiff experiences vertigo a couple times per week.  (*Id.*)  He also suffers from fatigue which drains his energy.  (*Id.*)  He gets skin lesions on his hands and legs a couple times per month.  (Tr. 60.)  In the past two years, there has never been a period of time when Plaintiff has not had a rash.  (*Id.*)

Plaintiff takes six different medications twice a day.  (*Id.*)  Side effects to the medication include diarrhea and nausea.  (Tr. 61.)  The nausea usually lasts half of the day and the diarrhea usually occurs during the daytime.  (Tr. 63.)  Plaintiff has trouble falling asleep due to his neuropathy and often feels exhausted.  (*Id.*)  He does not leave his house without his mother and his hobby is watching TV.  (Tr. 64.)  He has difficulty concentrating on the TV and often switches back and forth between watching TV and using the computer.  (*Id.*)

2.      **Medical Expert's Hearing Testimony**

Hershel Goren, M.D., testified as a medical expert at Plaintiff's administrative

hearing.  He testified that Plaintiff's severe impairments include amputation of three of his fingers on his right hand and substance abuse.  (Tr. 65.)  According to Dr. Goren, Plaintiff's HIV infection, peripheral neuropathy, and psychological impairments are not severe.  (Tr. 65-66.)  Dr. Goren testified that with regard to Plaintiff's HIV, the opinion of his treating physician, Dr. Hecker, lacks credibility, since Plaintiff could not have continuous symptoms of vertigo, as Dr. Hecker noted in July 2009.  (Tr. 66.)  "If indeed claimant has continuous symptoms of vertigo, he would be unable to stand, he would be unable to walk, and probably would be unable to sit."  (*Id.*)  Dr. Goren also disputed Dr. Hecker's opinion that Plaintiff has marked restrictions of daily living, because in October 2007, Dr. Hecker reported that Plaintiff had only moderate restrictions of activities of daily living.  (*Id.*)  Dr. Goren testified that there was no evidence in the record indicating that Plaintiff's ability to perform activities of daily living was marked.  (*Id.*)  Dr. Goren did not consider Plaintiff's HIV to be a severe impairment, because he did not see any objective evidence supporting the severity and he found Dr. Hecker's statements to be conclusory and unsupported by her own records.  (Tr. 67.)

Dr. Goren testified that he did not have enough information to comment about Plaintiff's potential mental impairments except for the substance abuse.  (*Id.*)  He noted that the record contains reports from two consultative evaluations and that both of those evaluations lack credibility.  (Tr. 68.)

In Dr. Goren's opinion, Plaintiff is capable of lifting and carrying ten pounds occasionally and less than ten pounds frequently; he cannot push, pull, reach, handle, finger, or feel with the right upper extremity; he can never crawl or use ladders, ropes, or scaffolds; and he cannot be exposed to unprotected heights.  (Tr. 69-70.)  Dr. Goren

did not find any mental limitations, because he did not have enough information to make such an assessment.  (Tr. 70.)

Dr. Goren agreed that Plaintiff suffers from HIV and that his HIV tests are repeatedly positive.  (Tr. 71.)  When questioned regarding Plaintiff's complaints of pain and fatigue, Dr. Goren testified that pain and fatigue are subjective symptoms and that it would be inappropriate for a physician to disagree with the claimant's subjective symptoms.  (Tr. 71.)  He testified that fatigue can occur in people who are HIV positive. (Tr. 72.)  He stated that Dr. Hecker would be the only person who would know about Plaintiff's HIV, because she treats him on a regular, continuous basis.  (Tr. 71.)  He expressed a concern that Dr. Hecker's notes are incomplete.  (*Id.*)  Dr. Goren testified that substance abuse is not material to a determination of disability but only as to whether Plaintiff would need a payee.  (Tr. 72.)

The ALJ questioned Dr. Goren regarding limitations in the use of the right hand. Dr. Goren testified that Plaintiff could still use the palm of his right hand, even if he was missing all of his fingers.  (Tr. 84.)  Plaintiff could use his right hand to steady objects and to assist, as long as he was not required to use his fingers.  (*Id.*)

### 3.    Vocational Expert's Hearing Testimony

Evelyn Sindelar testified as a vocational expert at Plaintiff's hearing.  She noted that Plaintiff has past work experience as an assembler, performed at the light, unskilled level, and as a machine operator and punch press operator, both performed at the medium, semiskilled level.  (Tr. 74.)

The ALJ proposed to the VE a hypothetical question in which he identified an individual with the same vocational factors as Plaintiff, limited to a light level of exertion

14

and further restricted to no right hand push/pull; no climbing ladders, ropes, or scaffolds; no crawling; no use of the right hand involving handling, fingering, reaching, or feeling; and no exposure to unprotected heights.  (*Id.*)  The VE testified that the hypothetical individual would be capable of performing Plaintiff's past work as an assembler.  (*Id.*)  She also identified additional light jobs that the individual could perform, such as a checker in a warehouse, a laundry worker, and an usher.  (Tr. 75.)

The ALJ proposed a second hypothetical which included limitations set forth in the first hypothetical but added that tasks must be simple and routine; no high production quotas or strict time requirements; no tasks involving arbitration, negotiation, or confrontation; and limited to tasks involving superficial interaction with co-workers and the public.  (*Id.*)  According to the VE, the hypothetical individual could work as an assembler.  (*Id.*)  She eliminated the usher job because it would involve working with the public, but stated that the individual could still work as a checker or laundry worker. (Tr. 75-76.)

The ALJ's third hypothetical set forth the same limitations as the first hypothetical but limited the individual to sedentary work.  (Tr. 76.)  The VE testified that the past relevant work would be eliminated, but she identified jobs such as charge account clerk, order clerk, and table worker.  (Tr. 77.)

The ALJ's fourth hypothetical was identical to hypothetical number two except that it limited the individual to sedentary work, eliminated strict time requirements for reporting to work and taking breaks, and added that the individual would be precluded from performing tasks involving high production quotas.  (Tr. 77-78.)  The VE opined that the table worker would be eliminated but the order clerk and charge account clerk

15

would remain.  (Tr. 79.)  She further identified a job as a dowel inspector.  (Tr. 80.)

The ALJ's fifth hypothetical question identified a person who would miss four or more days of work per month due to impairments or use of medication.  (Tr. 80.)  The VE testified that there are no jobs that such an individual could perform.  (*Id.*)

Plaintiff's counsel then questioned the VE regarding the jobs she previously identified.  Upon questioning, the VE eliminated the checker job if writing is required.  (Tr. 80-81.)  She eliminated the laundry worker job, because it could not be performed without functional use of the right hand.  (Tr. 81.)  She eliminated the charge account clerk job due to its requirement of public contact, which would mostly occur over the phone.  (Tr. 81-82.)  The ALJ asked the VE whether she could identify other jobs that would fit within the first hypothetical, and the VE testified that a job as a mail clerk could be done by using only one functional hand and the non-functional hand to assist, and a presser could be operated by one hand.  (Tr. 84.)

The ALJ questioned the VE with regard to all of the hypothetical questions, noting that the individual would have the following limitations and abilities: no ability to push, pull, or lift with the right hand; no ability to handle, finger, reach, or feel with the right upper extremity; the ability to assist with the right palm; the ability to use the left upper extremity to assist with lifting.  (Tr. 86.)  The VE indicated that her previous answers would remain the same.  (*Id.*)  When Plaintiff's counsel questioned the VE regarding the vocational significance of limitations with the dominant right hand, the VE opined that assembly jobs requiring two hands would be eliminated.  (Tr. 88.)

### III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he

establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national

17

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since July 14, 2009, the application date.

2.    The claimant has the following severe impairments: HIV+, amputation/loss of three fingers on the right hand, schizophrenia, alcohol dependence, and cocaine abuse.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of light work as defined in 20 C.F.R. § 416.967(b). The claimant cannot push or pull with the right hand, but the palm of his right hand can be used to assist in lifting with the left upper extremity.  The claimant is precluded from handling, fingering, reaching, or feeling with the right upper extremity.  Furthermore, he can never crawl or climb ladders, ropes, or scaffolds and must avoid unprotected heights.  In terms of his mental limitations, he is limited to simple, routine tasks performed in an environment free from high production quotas, arbitration, negotiation, and confrontation.  Finally, he is also limited to superficial interaction with co-workers and the public.

5.    The claimant is capable of performing past relevant work as an assembler.  This work does not require the performance of work related activities precluded by the claimant's residual functional capacity.

6.    The claimant has not been under a disability, as defined in the Act, since July 14, 2009, the date the claimant filed the application.

(Tr. 15-22.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignments of Error

Plaintiff argues that the ALJ erred when he found that Plaintiff's severe HIV infection does not meet the requirements of Listing 14.08(K).  Additionally, Plaintiff

argues that the ALJ erred by relying on vocational expert testimony to find that Plaintiff is capable of performing past relevant work as an assembler or a significant number of other jobs in the national economy.  The Court will address each argument in turn.

### 1. Whether the ALJ Erred in Finding that Plaintiff Failed to Meet the Criteria for Listing 14.08(K).

Plaintiff takes issue with the ALJ's finding that he does not meet the criteria for Listing 14.08(K).  Specifically, Plaintiff argues that his HIV infection satisfies the requirements of the listing based on Dr. Hecker's July 2009 opinion that he has repeated manifestations of HIV infection including vertigo, back pain, fatigue, and neuropathy and marked restrictions of activities of daily living.  (Tr. 371.)  According to Plaintiff, the reasons the ALJ gave in rejecting Dr. Hecker's opinion are not sufficient to satisfy the procedural requirements that an ALJ must follow when evaluating the opinion of a treating physician.  The Commissioner responds that it was proper for the ALJ to give little weight to Dr. Hecker's opinion, because Dr. Hecker did not explain her findings, and her opinion was inconsistent with the record as a whole.  In assigning less than controlling weight to Dr. Hecker's opinion, the ALJ notes that the evidence does not support Dr. Hecker's opinion that Plaintiff has marked limitations in activities of daily living, while it does support the medical expert's opinion that Dr. Hecker's assessment lacks credibility.  (Tr. 16.)

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20

20

C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  Bogle v. Sullivan, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  See Wilson, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," Bowie v. Comm'r of Soc. Sec., 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, Wilson, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  Id.

Listing 14.08(K) requires documentation of HIV infection plus repeated manifestations of HIV infection (including those listed in 14.08A through J but without the requisite findings for those listings) resulting in significant, documented symptoms or signs and marked[2] limitations of activities of daily living,[3] social functioning, or

---

[2]     To have a marked limitation, the claimant does not need to be totally precluded from performing an activity, but the degree of limitation must seriously interfere with the claimant's ability to independently, appropriately, and effectively function.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.00(I).

[3]     "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a

concentration, persistence, or pace.  20 C.F.R. Part 404, Subpart P, Appendix 1, at §

14.08(K).  On July 21, 2009, Dr. Hecker completed a form labeled *Medical Report on*

*Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection* (*"HIV Report"*).[4]

(Tr. 369-371.)  On the form, Dr. Hecker indicated that Plaintiff's HIV infection was

diagnosed by laboratory testing and other clinical findings.  (Tr. 369.)  She reported that

Plaintiff's repeated manifestations of HIV include symptoms of vertigo, back pain,

neuropathy in his hands and feet, and fatigue.  (Tr. 371.)  When asked to report the

number of episodes of each manifestation in a one-year period, Dr. Hecker noted that

each manifestation was "continuous."  (*Id.*)  She did not indicate the duration of each

episode.  (*Id.*)  Dr. Hecker also noted that Plaintiff has marked restrictions of activities

of daily living.  (*Id.*)  Thus, looking at Dr. Hecker's 2009 *HIV Report* alone, Plaintiff

would appear to meet the requirements of Listing 14.08(K).[5]

---

residence, caring appropriately for your grooming and hygiene, using
telephones and directories, and using a post office."  20 C.F.R. Part 404,
Subpart P, Appendix 1, § 12.00(C)(1).

[4]      This form was specifically developed by the Social Security Administration
to aid in determining disability for HIV claimants.

[5]      This is assuming that Dr. Hecker's findings of continuous vertigo, back
pain, fatigue, and neuropathy in the hands and feet meet Listing
14.08(K)'s requirement that the claimant experience "repeated
manifestations" of HIV infection, including those listed in 14.08A–J, but
without the requisite findings of those listings.  20 C.F.R. Part 404,
Subpart P, Appendix 1, at § 14.08(K).  Plaintiff assumes, without
explaining, that Plaintiff's condition satisfies the Listing.  (Plaintiff's Brief
("Pl.'s Br.") at 14-17.)  The Commissioner, however, argues that
complaints of back pain, fatigue, and vertigo are not manifestations of
HIV, but rather are symptoms (or possible signs) of a manifestation.
(Defendant's Brief ("Df.'s Br.") at 13, n. 2.)  The Commissioner also
contends that Dr. Hecker's treatment notes do not document that Plaintiff
has had continuous episodes of neuropathy as a manifestation of his HIV.

In finding that Plaintiff fails to meet Listing 14.08(K)(1), the ALJ purports to reject

Dr. Hecker's opinion and instead adopts the opinion of testifying medical expert Dr.

Goren.  The ALJ explains:

> Although Michelle Hecker, M.D., the claimant's provider, submitted an opinion on July 21, 2009 indicating the claimant has marked limitations in activities of daily living, the evidence does not support her contention (Exhibit 7F, p. 3).  According to medical expert Hershel Goren, M.D., this assessment lacks credibility.  In his opinion, the claimant could not suffer from continuous vertigo as Dr. Hecker alleges as if he did, he could not sit, stand, or walk.  Furthermore, he cited to an early report of Dr. Hecker's which indicated that the claimant only suffers from moderate restrictions with activities of daily living, and indicated that her own records do not support the alleged worsening (testimony).  The evidence supports this contention. . . . [T]he claimant cooks basic meals and rides a bike and has traveled to North Carolina to visit relatives (Exhibits 8F/2, 19F/29, testimony). Thus, the undersigned agrees with Dr. Goren and adopts his position regarding this issue.

(Tr. 16.)  Dr. Goren testified that Dr. Hecker's opinion lacks credibility, because if

Plaintiff was in fact suffering from "continuous" vertigo, "counsel would have had to

wheel the claimant in [to the hearing] on a Gurney."  (Tr. 66.)  However, Dr. Hecker's

notation on the *HIV Report* form that Plaintiff's vertigo was "continuous" was written

under the box labeled "No. of Episodes in the Same 1-Year Period" rather than under

the label "Duration of Each Episode."  (Tr. 371.)  Thus, the logical conclusion to be

drawn from a plain reading of the report is that Plaintiff's symptoms of vertigo occurred

on a continuous basis throughout a one-year period, not that Plaintiff experienced

─────────────────────

> (Df.'s Br. at 13.)  The issue before the Court is whether the ALJ gave good reasons for giving less than controlling weight to the opinions Dr. Hecker offers in her 2009 *HIV Report*.  As such, this Court will not decide whether Dr. Hecker's findings of vertigo, back pain, fatigue, and neuropathy satisfy Listing 14.08(K).

23

vertigo all day, every day.  Accordingly, Dr. Hecker's report of "continuous vertigo" does not detract from her credibility.  (Tr. 16.)  Nonetheless, the remainder of the ALJ's explanation for finding that Plaintiff fails to meet Listing 14.08(K) is sufficiently specific to make clear to this Court why he gave less than controlling weight to Dr. Hecker's opinion.  As discussed below, Dr. Hecker's reports and the evidence as a whole do not support a finding that Plaintiff has marked restrictions in activities of daily living.  (Tr. 16.)

The Commissioner is not bound by a treating physician's opinion; an opinion receives greater weight only if it is supported by sufficient clinical findings and is consistent with other evidence.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 652 (6th Cir. 2006).  Here, the ALJ properly found that Dr. Hecker's finding of marked limitations in Plaintiff's activities of daily living is not sufficiently supported by her records and is inconsistent with the evidence as a whole.  The ALJ focused in particular on Plaintiff's ability to cook basic meals, ride a bike, and travel to North Carolina to visit relatives.  (Tr. 16, 20, 47, 49, 55, 58, 520, 537.)  While Plaintiff testified that his condition has worsened and that he has "cut down on a lot of activity," the ALJ makes note of several factors that lessen Plaintiff's credibility.  (Tr. 19, 59.)  For example, the ALJ discusses the opinion of Dr. Pickholtz, who determined that there was a "significant amount of exaggeration" going on during his interview with Plaintiff.  (Tr. 19.)  The ALJ notes, "[a]ccording to Dr. Pickholtz, the claimant's overall test scores were inconsistent with his abilities to go on to the computer as well as his ability to understand what he reads and sees (Exhibit 3F, p. 6.)"  (*Id.*)  According to the ALJ, this suggests Plaintiff has "consciously attempted to portray limitations that are not actually present in order to

24

increase the chance of obtaining benefits." (*Id.*)  Furthermore, the ALJ notes that Plaintiff's lack of follow-through with his medications suggests that his symptoms are not as severe as he alleges.  (Tr. 18.)

In addition to the evidence the ALJ specifically addresses, the record includes other evidence corroborating the ALJ's determination that Plaintiff's HIV infection and its treatment has not precluded him from performing daily activities independently most of the time.  For example, in an interview with an agency employee in August 2009, Plaintiff reported that he was able to watch TV, go to the grocery store with his mother, help prepare meals, use the stove and microwave, visit with friends, vacuum, put dishes in the dishwasher, and do his laundry.  (Tr. 278.)

The ALJ also observes Dr. Goren's testimony that Dr. Hecker's earlier *HIV Report* from 2007 indicated that Plaintiff had only moderate restrictions of daily living due to fatigue and nausea.  (Tr. 16, 337.)  Dr. Goren found, and the ALJ agreed, that Dr. Hecker's records do not support an alleged worsening of Plaintiff's condition.  (Tr. 16, 20, 66, 337.)  Indeed, Dr. Hecker's records do not show that, between 2007 and 2009, Plaintiff's condition reached the point of seriously interfering with his ability to independently, appropriately, and effectively function.  (Tr. 16, 20, 384-391, 393-401, 468-479.)  Plaintiff argues that Dr. Hecker's opinion, along with her treatment notes, support a finding that Plaintiff meets the requirements of Listing 14.08(K).  Plaintiff argues in his Brief that "Dr. Hecker's notes reveal that [Plaintiff] has consistently complained of fatigue, nausea and pain from peripheral neuropathy."  (Pl.'s Br. at 17.) However, Plaintiff does not cite to any pages in the record for this Court to reference. (*Id.*)  Moreover, Plaintiff testified at his hearing that in late 2009 and into 2010 (thus

25

*after* Dr. Hecker completed her July 2009 *HIV Report*), he could clean, help his mother and terminally ill brother, cook basic meals, go shopping, and take public transportation if he so desired.  (Tr. 47-49, 56.)  Therefore, Plaintiff's own testimony does not support Dr. Hecker's opinion that Plaintiff has marked restrictions of activities of daily living as of July 2009.  Accordingly, and for the foregoing reasons, Plaintiff's first assignment of error provides no basis for remand in this case.

>    **2.   Whether the ALJ Erred in Relying on Vocational Expert Testimony to Find Plaintiff Capable of Performing Past Relevant Work as an Assembler or a Significant Number of Other Jobs.**

Plaintiff argues that the record does not support a finding that, given his residual functional capacity ("RFC"), he is capable of performing either his past work as an assembler or a significant number of other jobs in the national economy, including a checker and laundry worker.  According to Plaintiff, the VE did not consider all of the limitations assessed by the ALJ when responding to his hypothetical questions, and when Plaintiff's counsel later presented the omitted limitations to the VE, the VE eliminated the jobs she had previously identified.

The ALJ determined that Plaintiff could perform his past relevant work as an assembler, because it did not require the performance of work-related duties precluded by his RFC.  (Tr. 21.)  Plaintiff contends that the VE "scratched" her testimony that Plaintiff could work as an assembler after counsel pointed out that some assembly jobs require two hands.  (Tr. 88.)  However, the VE did not eliminate the assembler job altogether.  Rather, she limited Plaintiff to assembler jobs that do not require two hands.  (*Id.*)  At the end of her testimony, the VE clarified that Plaintiff could perform his

26

past relevant work as an assembler, but each assembler job would have to be considered separately.  (Tr. 89.)  Thus, the VE's testimony supports the ALJ's conclusion.  Moreover, additional evidence supports the ALJ's determination: Plaintiff was able to work as an assembler even after the amputation of three of his fingers in 1998, and there was no medical evidence that he had developed residuals from his amputation that prevented him from working as an assembler.

The ALJ also determined that there are other jobs existing in the national economy that Plaintiff is able to perform.  (Tr. 21.)  Plaintiff challenges this finding, arguing that, upon questioning by counsel, the VE eliminated the checker job, because it may require writing, and the laundry worker job, because it could not be performed without functional use of the right hand.  (Tr. 80-81.)  As to the checker job, Plaintiff fails to note that the VE eliminated only checker jobs that require writing.  (Tr. 81.)  The VE noted that while the job may require some writing, such work could be done using a computer instead.  (*Id.*)  Here, there is no dispute that Plaintiff can use a computer.  He surfs the Internet, checks his email, and plays video games.  (Tr. 54-55, 63, 340, 343, 434.)  Regarding the laundry worker job, it is true, as Plaintiff points out, that the VE eliminated the job after counsel clarified that one could not fold laundry without having functional use of the right upper extremity.  (Tr. 81.)  However, when the ALJ asked the VE if there were any additional jobs that the hypothetical individual could perform, the VE offered mail clerk (5,460 jobs in state, 200 regionally) and machine presser (7,260 jobs in state, 190 regionally).  (Tr. 83-84.)  Although the ALJ did not specifically address these additional jobs in his opinion, this is further evidence supporting his determination that there are jobs that exist in significant numbers in the national economy that Plaintiff

can perform.  Accordingly, Plaintiff's second assignment of error is not well taken.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: September 30, 2013